1
2
3
4
5
6
7
8

IN THE UNITED STATES DISTRICT COURT FOR THE

9

EASTERN DISTRICT OF CALIFORNIA

10

| | | |
|---|---|---|
| TERRY ADAMS, | ) | 1:08-cv-00156 OWW GSA |
| | ) | |
| Plaintiff, | ) | **FINDINGS AND RECOMMENDATION** |
| | ) | **REGARDING PLAINTIFF'S SOCIAL** |
| vs. | ) | **SECURITY COMPLAINT** |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | (Docs 20 & 29) |
| of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

17
18

## **BACKGROUND**

19        Plaintiff Terry Adams ("Plaintiff") seeks judicial review of a final decision of the

20 Commissioner of Social Security ("Commissioner") denying his application for disability insurance

21 benefits and supplemental security income pursuant to Titles II and XVI of the Social Security Act.

22 The matter is currently before the Court on the parties' briefs, which were submitted without oral

23 argument, to the Honorable Gary S. Austin, United States Magistrate Judge, for findings and

24 recommendation to the District Court.

25 //

26 //

27 //

28
                                          1

**FACTS AND PRIOR PROCEEDINGS**[1]

In February 2001, Plaintiff filed applications alleging disability since April 28, 2000, and June 2, 1997, respectively.  AR 74-76, 365-67.  His application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 58-61, 62-63, 65-69.  ALJ Rocklin C. Lyons held a hearing on October 3, 2002, and issued an order denying benefits on November 7, 2002.  AR 16-21, 389-406.  Plaintiff sought judicial review of the determination and filed an action in this Court, case number CV-F-04-5974 TAG.  On March 16, 2005, the parties stipulated to remand pursuant to sentence four of Title 42 of the United States Code section 405(g).  AR 446-447, 450-451.

On December 8, 2005, ALJ James Berry held a hearing in Fresno, California.  AR 616-49.  Thereafter, on February 23, 2006, the ALJ issued an order denying benefits.  AR 420-28.  On November 28, 2007, the Appeals Council denied review.  AR 407-10.

Hearing Testimony

ALJ Berry held a hearing on December 8, 2005, in Fresno, California.  Plaintiff appeared and was represented by Jeffrey Milam.  Vocational Expert ("VE") Thomas C. Dachelet also provided testimony.  AR 616-49.

Plaintiff has not worked since the previous hearing before ALJ Lyons.  His medical condition has not improved since that time, and in fact he now suffers from arthritis in his wrists, back and knees.  AR 620-21.  His right knee is worse; the pain in constant.  AR 621.  Plaintiff did not improve following a year long course of therapy at University Medical Center (UMC).  AR 621.  Exercise did not provide relief and resulted in "too much swelling" and popping in the wrists and knees.  AR 622.  Plaintiff currently takes medication for the pain, but suffers from nausea as a side effect.  AR 622.

The pain in Plaintiff's back and knees worsens "[j]ust walking around, trying to do anything physical."  AR 622-23.  On a good day, Plaintiff can stand for about an hour or two.  On a bad day

---

[1]References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

however, Plaintiff cannot get out of bed.  He has one or two good days a week.  AR 623.  On a good day, Plaintiff can sit for two or three hours.  Again, on a bad day, he "can't get up some days."  AR 623.  He has two or three bad days a week.  AR 623.  His back and knee problems cause him to lie down.  AR 624.

With regard to his wrists, Plaintiff experiences a little swelling and pain, and gets "big knots" in his wrists.  AR 624.  It comes and goes.  On a good day he can use his hands for two to three hours constant; on a bad day, he cannot use his hands at all.  On average, two to three days a week are bad days.  AR 624.

Asked about a normal, good day, Plaintiff indicated he spends more time off his feet than on them.  Other than the four hours he may be standing on a good day, he is sitting or lying down.  AR 625.  In a normal eight-hour day, on a good day, Plaintiff estimated he could be on his feet "a couple hours."  AR 625-26.

The heaviest weight Plaintiff can lift is about twenty pounds because of his wrists, regardless of whether he is having a good day or a bad day.  AR 626.

Plaintiff suffers with problems concentrating.  He does not know what causes the problem.  AR 626.[2]

Diabetes causes Plaintiff many problems.  Also, a number of family members have passed away as a result of the disease.  AR 630.  He experiences pain, nausea, sexual dysfunction, and feels like he is "dying."  AR 631.  The vomiting and gastrointestinal issues are related to the diabetes according to the doctors.  AR 631-32.  Plaintiff has no energy and suffers from numbness and tingling in his feet.  AR 632.  These problems affect him all day, every day.  AR 632.

Currently Plaintiff is treated for both Type I and Type II diabetes.  He receives periodic insulin shots and takes medication daily.  AR 632-33.

Plaintiff admitted drug and alcohol problems while serving in the military, and when asked by counsel whether he admitted to using marijuana for pain at the previous hearing, Plaintiff

---

[2]During this line of questioning, Plaintiff became upset and could not answer counsel's questions.  AR 627.

1  indicated he uses "very little" and while he is not a "saint," it is not a problem.  AR 633.  Plaintiff

2  then indicated he does not currently use and that it has been more than a year since his last use of

3  illegal drugs.  AR 633.  He quit because he is "old."  AR 634.  With regard to alcohol consumption,

4  Plaintiff indicated he has never been a big drinker because the diabetes made him a "lightweight."

5  The medication he takes, if combined with alcohol, will make him "fall out" so he does not drink.

6  AR 634.

7       Asked about the cane he was using, Plaintiff indicated he has been using the cane since his

8  work-related injury.  It was prescribed by a doctor.  He does not recall which doctor prescribed the

9  cane, but it was a physician connected to his workers' compensation matter.  AR 635.

10       Plaintiff indicated that he does not "do much of anything."  He does not visit family or shop.

11  He does attend medical appointments.  AR 628.  He did not know the names of his treating

12  physicians because they frequently change.  He is treated at UMC.  He indicated, in response to

13  whether he was receiving treatment for mental health problems, that he is receiving treatment for

14  emotional issues.  AR 628.

15       Plaintiff indicated he has four children, with whom he lives.[3]  AR 628-629.  The twins are

16  eight years old, and he has a twelve-year-old and a seventeen-year-old.  Their mother also resides in

17  the home.  AR 629-30.  Plaintiff indicated his workers' compensation benefits have been depleted,

18  and the family receives welfare benefits currently.  AR 630.

19       In response to questions posed by the ALJ, Plaintiff indicated he was originally injured on the

20  job in the year 2000 or 2001.  AR 635.  He is not married to the mother of his children, and she

21  works part-time while attending school to become a nurse.  AR 635-36. When his children were

22  younger, Plaintiff did not stay home to care for them.  Rather, he always worked.  AR 636.  He

23  completed the twelfth grade, entered the military and attended Pasadena City College and Fresno

24  City College, but he does not know how many credits he may have earned.  AR 636-37.

25

26

27       [3]Plaintiff became upset again, and a three to four minute recess was taken.  AR 629.

28

1   Plaintiff does have a driver's license, but does not currently drive because he has "been

2   having blackouts."  AR 637.  He has never been convicted of a felony and is not on either probation

3   or parole.  AR 637.

4   In response to a question whether the medications he is currently taking are helpful, Plaintiff

5   replied, "Yes, I guess.  Yeah."  AR 637.  He takes the medications as prescribed by his doctors.  AR

6   638.

7   His workers' compensation matter is in "limbo" because of an issue related to rehabilitation.

8   AR 638.

9   The longest period of time that Plaintiff could be standing on his feet in an eight-hour period

10  is two to three hours.  The same period would apply to walking and sitting.  AR 638-39.  To clarify,

11  and in response to a follow up question through counsel, Plaintiff testified that he can walk or stand

12  two to three hours total in an eight-hour day.  AR 640.  Plaintiff can carry between ten and twenty

13  pounds.  AR 638.

14  When asked about his past work history, Plaintiff testified that he does not recall working as

15  a security officer in 1992 through 1994, does not recall working as an assistant manager in apartment

16  security from 1995 to 1996, and does not recall working as a security guard at UMC in 1997.  AR

17  641.  A disability report indicates Plaintiff worked in the construction industry from 1979 to 1999.

18  Plaintiff was injured while working as a general laborer.  AR 641-642.

19  VE Dachelet testified that Plaintiff's past relevant work in construction was classified as

20  heavy physical demand and unskilled, whereas the security officer position is a semi-skilled position

21  with light physical demands.  The skills do not transfer.  AR 643-44.

22  Asked to assume a hypothetical worker of forty-six years of age, with some college education

23  and the past relevant work experience described, with an ability to stand and walk six hours in an

24  eight-hour day, as well as sit six hours in an eight-hour day, each at least two hours at a time, with

25  the ability to lift and carry fifty pounds occasionally and twenty-five pounds frequently, with

26  occasional climbing, stooping and kneeling, the VE indicated that Plaintiff could perform his past

27  relevant work as a security officer.  AR 644.

28

Next, asked to consider a similar individual who can lift and carry twenty pounds occasionally and ten pounds frequently, who can stand, walk and sit for a total of two to three hours in an eight-hour work day, who would require the assistance of a cane to ambulate, retains the ability to stand occasionally for one to two hours at a time, sit for two to three hours at a time, and use his hands for fine manipulation two to three hours a time, and whom suffers from nausea due to medication consumption for one-third to one-half of the work day, the VE indicated that work is closed for such an individual.   AR 644-45.

In a hypothetical posed by Plaintiff's counsel, wherein an individual of Plaintiff's age, education and past work experience could lift ten pounds frequently, twenty pounds occasionally, could stand and/or walk two to four hours per day, sit for six hours per eight-hour day, with occasional climbing and crawling, and frequent balancing, stooping and kneeling, with moderate mental restrictions of not more than two-thirds, the VE indicated past relevant work as a security guard remained available.  AR 645-46.

In another hypothetical posed by counsel, that involves medium work, coupled with the mental restrictions of poor ability to use judgment, deal with work stress, function independently, maintain attention and concentration, poor ability to remember, understand and carry out simple job instructions, and a poor ability to demonstrate reliability, the VE indicated Plaintiff's past relevant work would not be available.  AR 647.

Finally, considering an employee of Plaintiff's age, education and work experience, without mental restriction, who could sit for a full work day and stand or walk no more than one hour in the eight-hour work day, with only occasional bilateral simple grasping and fine finger manipulation, and occasional use of right foot controls, and all postural limitations are occasional, the hypothetical employee could not perform any of past relevant work.  No other jobs would be available.  AR 647-48.

Medical Record

The entire record was reviewed by the Court, however, only those portions relevant to the instant proceedings are briefly summarized below.

*Magnetic Resonance Imaging*

The MRI of October 18, 2000, revealed a moderate intraarticular effusion, a "delicate" hypersensitivity in the medial meniscal body and posterior horn, slight irregularity of the inferior articular surface of the posterior horn, changes in the posterior horn consistent with horizontal intrameniscal tear penetrating the inferior articular surface; mild degenerative osteoarthritic spurring associated with chondromalacia of the weight bearing surface; chondromalacia with articular cartilage fissuring along the articular surface of the medial patellar facet; and medial bowing and Grade I strain of the medial collateral ligament.  AR 247-248.

*John L. Branscum, M.D.*

On March 19, 2001, Dr. Branscum performed a Qualified Medical Evaluation of Plaintiff. The doctor reviewed the medical records available, and conducted his own examination.  AR 194-205.

Dr. Branscum noted Plaintiff appeared in no acute distress during the interview portion of the examination.  Plaintiff had to push himself to a standing position by pushing himself up off of a desk, and walked with a "severe Grade II-III limp on the right, both with and without the cane."  AR 199.

Plaintiff's wrists revealed no abnormalities and the range of motion was normal.  AR 199-200.  His hands revealed no abnormalities and he had full range of motion.  His grip strength was normal, although it was noted that "he did not put forth maximum effort."  AR 200.

The lumbar spine examination revealed no abnormality or tenderness.  The range of motion was normal.  Straight leg raising was normal, and flexion of the knees was not painful.  AR 200.

With regard to lower extremities, it was noted that while Plaintiff was seated the feet and ankles were normal and the reflexes are normal in the heels and knees.  AR 200.  With regard to the right knee joint specifically, Dr. Branscum noted a full range of motion to 105 degrees from flexion. Plaintiff refused to bend the knee further because of pain.  The patella, when gently squeezed, caused Plaintiff to "writhe about, make facial grimaces and complain vociferously of intolerable pain."  AR 201.  Dr. Branscum noted that flexion and extension of the knee results in "audible and palpable

7

1  interarticular subpatellar crepitation." AR 201.  Ligament testing, pivot shift and related testing

2  revealed no instability.  Strength testing was not performed.  AR 201.  The left knee joint

3  examination revealed flexion to 105 degrees, subpatellar popping with flexion and extension, yet no

4  joint tenderness, subpatellar crepitation or tenderness was detected.  AR 201.

5       Dr. Branscum's diagnoses included moderately severe degenerative arthritis of the right knee

6  status post-operative, and bilateral sprained wrists resolved.  AR 201.  Dr. Branscum noted the "MRI

7  findings are disturbing," referring to the Grade III transverse intermeniscal signal that communicated

8  with the inferior surface.  AR 202.  This is so because he believed "[i]t would be unusual to have

9  degenerative arthritis of the degree described in the MRI without having degenerative tears."  AR

10  203.  Dr. Branscum determined Plaintiff was permanent and stationary.  His objective findings

11  included the MRI of the right knee; however, the doctor did not identify any objective findings

12  regarding Plaintiff's wrist-related complaints.  AR 202.  The right knee precluded prolonged weight-

13  bearing, heavy lifting, climbing, walking on uneven ground, squatting, kneeling, crouching,

14  crawling, and pivoting.  AR 202.  Dr. Branscum recommended Plaintiff be seen by an orthopedic

15  surgeon for possible arthroscopy, and that Plaintiff receive "conservative care including over-the-

16  counter medications and a knee brace."  AR 203.

17       *Troy Smith, M.D.*

18       On April 10, 2001, Dr. Smith completed an orthopedic consultation regarding Plaintiff's

19  complaints of back and knee problems.  AR 183-188.

20       Plaintiff attributed his back injury to "doing some lifting" three years previously.  He

21  indicated other injuries to his back have aggravated his symptoms.  He claimed the back pain had

22  cleared up, but indicated pain returns with activities such as bending and lifting.  When cautious

23  about activity, Plaintiff reported doing relatively well.  His knee problems are the result of a twisting

24  injury while working.  An MRI revealed degenerative changes and a possible torn medial meniscus.

25  He was advised regarding orthopedic surgery, and apparently told he had a 50/50 chance of

26  improvement, and opted not to undergo surgery because he feared it would worsen the condition.

27  Plaintiff indicated he has been using a cane since that time because it helps with walking and the

28

pain.  He cannot kneel, squat or climb stairs, and swelling is a problem whenever he increases

activity.  AR 183.  Plaintiff reported he could sit for six hours before getting up to move around,

could stand for four hours before needing to rest, and can walk one mile without difficulty.  AR183-

184.

At the time of the examination Plaintiff did not appear to be in distress or pain.  He got on

and off the examination table without discomfort.  He walked without evidence of a limp or

discomfort, and could stand on his toes and heels without difficulty.  AR 184.  Moderate tenderness

was noted in the lumbar spine, no swelling or abnormality was noted in the right knee.  The knee was

stable and a torsion test revealed no locking or catching.  AR 185.

Dr. Smith noted low back pain due to unknown etiology, and possible internal derangement

with early osteoarthritis of the right knee.  AR 187.  Plaintiff was to avoid repeated bending or heavy

lifting.  He could lift fifty pounds occasionally and twenty-five pounds frequently, could sit, stand

and walk for six hours in an eight-hour day with rest breaks, and could climb stairs, kneel and squat

on an occasional basis.  AR 187.  Dr. Smith noted as follows regarding Plaintiff's cane: "As long as

he is able to hang onto an object he does not need to use the cane but in the work place he would

probably be better off using a cane to keep his knee from giving way."  AR 187.

*Ernst Wong, M.D.*

Dr. Wong completed a Function Capacity Assessment form on April 20, 2001.  AR 206-213.

His review determined that Plaintiff could lift and carry fifty pounds occasionally, twenty-five

pounds frequently, could stand or walk about six hours in an eight-hour day, sit six hours in an eight-

hour day, and was not limited as to pushing or pulling.  Dr. Wong adopted the findings of the

consultative examiner regarding restrictions to lifting, noting the findings are objective as to the

lumbar spine.  AR 207.  Postural limitations of occasional climbing, stooping, and kneeling were

noted due to the right knee.  AR 208.  Dr. Wong noted no manipulative, visual, communicative or

environmental limitations.  AR 209-210.  The doctor noted that Plaintiff's complaints regarding the

severity and duration of his symptoms was disproportionate to what is expected for the impairment

claimed.  AR 211.  The doctor noted Plaintiff was "partially credible" but pointed out that his

complaints regarding the severity of his inability to lift and difficulties standing and walking were not supported by his normal gait, strength, sensation and reflexes.  He also noted that "Dr. Smith states [claimant] does not require cane use as long as [claimant] can hold onto objects but this is not supported by normal strength, normal gait, [range of motion], coordination . . .."  AR 212.  He noted also that the orthopaedist's observation that Plaintiff had "severe antalgic gait" was inconsistent with the consultative examiner's findings because Plaintiff walked without antalgic gait, and had no difficulty moving on and off the examination table.  AR 213.

On October 8, 2001, Dr. Wong's findings were separately reviewed and affirmed as written.  *See* AR 206.

*X-Ray*

An October 3, 2001, x-ray of the right knee evidenced minor degenerative changes in the medial and lateral compartments of the knee, as well as in the patellofemoral joint.  No other significant abnormalities were noted.  AR 344.

*Robert M. Trimmer, M.D.*

On March 1, 2004, Dr. Robert Trimmer treated Plaintiff at Fresno County Mental Health.  He reported feeling more anxious and depressed on the medication previously prescribed.  He did not want to leave the house at times and had nightmares.  He denied hallucinations or suicidal ideation.  His mood was depressed and he appeared irritable, mildly angry and a little anxious.  His behavior, speech, perceptions, thought process and content, were normal.  A prescription for Zoloft was refilled.  AR 498.

In a progress note dated March 16, 2004, Plaintiff advised Dr. Trimmer that he didn't care any longer and he was "tired of the 'bullshit.'"  He did not explain himself further.  Dr. Trimmer noted his own suggestions were promptly disregarded.  Plaintiff indicated he was not sure he wished to participate in therapy.  He discussed the difficulty of living with diabetes and of not having sex.  Plaintiff left the room after it was suggested that therapy with an African-American individual may be beneficial as Plaintiff had been "very vocal about the difficulties of being African-American."  AR 497.

On March 29, 2004, Plaintiff reported he was very tired, and talked about the difficulties of dealing with diabetes.  He reported an interest in psychotherapy, and indicated he gets irritable and angry when others tell him he does not look well.  Dr. Trimmer indicated Plaintiff exhibited less eye contact than in a previous visit, that he was less irritable and less challenging, but remained preoccupied with racism, claiming doctors do not care about Black people.  AR 496.

Progress notes dated April 26, 2004, reflect Plaintiff felt "'weird'" on Wellbutrin.  He noted increased nightmares, and was not sure whether he wished to continue taking the medication.  He indicated he was not ready for psychotherapy.  He discussed difficulties living with diabetes and the possibility of dying young as a result of the disease.  His mood was restricted and less angry than usual.  His behavior, speech, perceptions, thought process and content, insight and judgment were good.  He agreed to continue taking the Wellbutrin.  AR 494.

On June 15, 2004, Plaintiff reported for an appointment that had actually been scheduled the day prior.  He asked the doctor to complete a Social Security form, and the two reviewed the symptoms together.  It was noted that Plaintiff continued to meet criteria for major depressive disorder, with poor mood, fluctuating appetite, poor sleep and concentration, feelings of worthlessness and suicidal ideation without intent or plan.  AR 492.

Plaintiff reported "a lot of personal things going on" but refused to discuss specifics on July 27, 2004.  He reported difficulty with sleeping and appetite, and had little energy.  He denied feeling suicidal and was not anhedonic but took little pleasure in anything other than his children.  He reported that his vehicle was towed weeks ago and his Wellbutrin was in the vehicle.  Other than a somewhat blunted affect, Plaintiff was well groomed, displayed no abnormal movements, speech or perceptions, his thought process and content were normal, and his insight and judgment were good.  Plaintiff was provided with another prescription for Wellbutrin.  AR 491.

In progress notes dated August 24, 2004, Plaintiff was not sure the prescribed Wellbutrin was helping.  He was upset that his electricity had been disconnected and he was without air conditioning.  He was not eating well, but did not think about suicide.  On this occasion Plaintiff

11

1    appeared more subdued than usual, presented a blunted affect and appeared depressed.  The

2    Wellbutrin prescription was increased to 300 milligrams.  AR 489.

3        On September 21, 2004, Plaintiff reported he was "doing a lot better."  His mood was

4    improved overall.  He admitted that when his electricity had been disconnected he considered

5    suicide.  It was noted Plaintiff did not make any eye contact, but was otherwise well.  No

6    abnormalities in behavior, speech, affect, perception, thought process or content, insight or judgment

7    were noted.  AR 488.

8        Progress notes dated October 19, 2004, indicate that Plaintiff was seeking to challenge a

9    workers' compensation settlement and that he needed "a letter stating that he needs more time to find

10   a lawyer."  He reported he was having difficulty concentrating due to financial problems, but he did

11   not think about harming himself.  It was noted Plaintiff was "moderately anxious" and closed his

12   eyes while speaking for the most part, but did make some eye contact.  Otherwise his behavior,

13   speech, perceptions, thought process and content, insight and judgment were good.  It was noted

14   Plaintiff was improving and Wellbutrin was to be continued.  AR 486.  A note written on the same

15   date reads: "Terry Adams is a patient of mine . . ..  He has been dealing with multiple stressors

16   recently that have caused him some difficulty concentrating, as well as emotional difficulties.  He

17   could use further time to prepare for his case . . . [and] to contact a lawyer . . .."  AR 487.

18       On October 25, 2004, Dr. Trimmer prepared the following:

19       To whom it may concern: [¶] Terry Adams has been under my care throughout most
         of 2004.  He has significant problems with anxiety and depression, and due to
20       numerous recent stressors that have exacerbated these problems, may have difficulty
         attending his scheduled court date.  If possible, please postpone the court date.

21

22   AR 484-485.

23       On November 16, 2004, Dr. Trimmer's notes indicate Plaintiff was suffering from financial

24   stress and had been irritable generally.  The notes also indicate that the Wellbutrin was helping

25   Plaintiff.  Dr. Trimmer's evaluation was normal but for a note that Plaintiff "[a]ppears mildly

26   anxious, but affect is brighter than it has been in the past, [patient] seems happier overall."  AR 483.

27

28                                              12

*Ariel L. Troncoso, M.D.*

On January 28, 2005, Dr. Troncoso with Fresno County Mental Health saw Plaintiff as a walk in client. He appeared depressed and overwhelmed, and had difficulty expressing his needs. After much prompting, he indicated that "he needed a letter."  A caseworker provided the doctor with information regarding Plaintiff's "fragile state of mind and the complex stressors he was" experiencing.  Plaintiff refused to discuss medications, and when a follow up appointment was recommended, he got up and left.  AR 482.  That same date, Dr. Troncoso completed a progress note that included the following notation:

> To whom it may concern: [¶] Mr. Terry Adams has been under our care in 2005-2005 [*sic*].  He has significant problems with anxiety, depression and continuing multiple stressors currently.  He will most likely have difficulty attending his scheduled court date.  We ask that the court date please be postponed.  We also request due to his fragile mental state that, if possible, his case be transferred to Fresno County.  He will continue to be under our care.

AR 579.

On September 2, 2005, Plaintiff appeared well-groomed, maintained eye contact, and was "reluctantly cooperative."  His speech was loud and angry, his thought process was linear, coherent and goal-directed.  His affect was irritable and his insight was fair.  He wanted another doctor to treat him, yet when he was asked to interview in a private room with security about the matter, he refused to do so and walked out.  AR 476-477.

On November 4, 2005, Dr. Troncoso completed a "Complete Medical Report (Mental)" form regarding Plaintiff.  AR 572-575.  The report indicates she treated Plaintiff between January 28, 2005 and September 2, 2005, for major depressive disorder.  The diagnostic symptoms included anxiety, depression, anhedonia, irritability and sadness, and included a prognosis of chronic depression.  AR 572.

Dr. Troncoso noted that Plaintiff's ability to follow work rules, relate to coworkers, deal with the public and interact with supervisors was fair.  The doctor believed Plaintiff's ability to use judgment, deal with work stress, function independently and maintain attention/concentration were poor.  AR 573.  Plaintiff's ability to understand, remember and carry out complex, detailed or even

13

1   simple instructions was poor.  AR 574.  Plaintiff could fairly maintain his personal appearance and

2   behavior in an emotionally stable manner, yet his ability to relate predicably in social situations and

3   to demonstrate reliability was poor.  AR 574.  Dr. Troncoso did not describe any limitations nor did

4   she identify any medical or clinical findings in support of her conclusions.  AR 573-574.

5   **ALJ's Findings**

6       The ALJ determined that Plaintiff has the severe impairments of degenerative disc disease

7   and degenerative joint disease of the right knee.  Nonetheless, the ALJ determined these severe

8   impairments did not meet or equal any listing impairments so as to result in a disability finding.

9   With regard to depressive disorder, the ALJ found that it did not amount to a severe impairment

10  because the limitation had only a minimal effect, if any, on Plaintiff's ability to work.  AR 421-22.

11      Based on his review of the medical evidence, the ALJ determined that Plaintiff retained the

12  residual functional capacity ("RFC") to lift and carry fifty pounds occasionally and twenty-five

13  pounds frequently, is able to stand, walk, and sit for six hours each, and for at least two hours at a

14  time, in an eight-hour work day, with limitations to occasional climbing, stooping and kneeling.  AR

15  426.

16      Given this RFC, the ALJ found that Plaintiff could return to his past work as a security guard,

17  a semi-skilled position performed at the light exertional level, as it did not require work-related

18  activities precluded by the RFC.  AR 426.

19  **SCOPE OF REVIEW**

20      Congress has provided a limited scope of judicial review of the Commissioner's decision to

21  deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the

22  Court must determine whether the decision of the Commissioner is supported by substantial

23  evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla,"

24  *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

25  *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

26  reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.

27  The record as a whole must be considered, weighing both the evidence that supports and the

28  14

1  evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993, 995

2  (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must apply the

3  proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court

4  must uphold the Commissioner's determination that the claimant is not disabled if the Secretary

5  applied the proper legal standards, and if the Commissioner's findings are supported by substantial

6  evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

7  ## REVIEW

8       In order to qualify for benefits, a claimant must establish that he is unable to engage in

9  substantial gainful activity due to a medically determinable physical or mental impairment which has

10  lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §

11  1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of such severity

12  that he is not only unable to do her previous work, but cannot, considering his age, education, and

13  work experience, engage in any other kind of substantial gainful work which exists in the national

14  economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).  The burden is on the

15  claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

16       In an effort to achieve uniformity of decisions, the Commissioner has promulgated

17  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20 C.F.R.

18  §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  This five-step analysis can be summarized as follows:

19  (1) determination of whether the claimant is engaged in substantial gainful activity; if so engaged,

20  the claimant is not presumed disabled and the analysis ends; (2) if not engaged in substantial gainful

21  activity, determination of whether the claimant has a severe impairment; if not, the claimant is not

22  presumed disabled and the analysis ends; (3) if the claimant has a severe impairment, determination

23  of whether any such severe impairment meets any of the impairments listed in the regulations; if so,

24  the claimant is disabled and the analysis ends; (4) if the claimant's impairment is not listed,

25  determination of whether the impairment prevents the claimant from performing his or her past

26  work; if not, the claimant is not presumed disabled and the analysis ends; and (5) if the impairment

27  prevents the claimant from performing his or her past work, determination of whether the claimant

28

1   can engage in other types of substantial gainful work that exist in the national economy; if so, the

2   claimant is not disabled and the analysis ends.

3        Here, Plaintiff argues that ALJ Berry is biased against Plaintiff's counsel to Plaintiff's

4   detriment, the ALJ's decision was not supported by substantial evidence, the ALJ did not properly

5   assess Plaintiff's credibility, and Plaintiff's treating physicians' opinions were not properly

6   considered.                                        **DISCUSSION**

7        **A.    ALJ Berry's Purported Bias**

8        Plaintiff claims that ALJ Berry is biased toward Plaintiff's counsel to the detriment of

9   Plaintiff.  Plaintiff relies on the Court's previous finding of bias by ALJ Berry toward Jeffrey Milam,

10  in the matter entitled *Hixson v. Astrue*, 1:06-cv-00353-OWW-DLB, in support of his position.

11  Defendant counters that Plaintiff has failed to demonstrate any evidence in the instant record to

12  establish bias by the ALJ, and points out that the hearing in the *Hixson* matter occurred after the

13  instant matter.  Moreover, Defendant asserts there is no evidence that Milam asked ALJ Berry to

14  recuse himself.

15       When faced with a claim of bias, the Court must start with the presumption that

16  administrative adjudicators are unbiased and that they exercise their decision-making authority with

17  honesty and integrity.  *See Schneider v. McClure*, 456 U.S. 188, 195-196 (1982); *Withrow v. Larkin*,

18  421 U.S. 35, 47 (1975); *Rollins v. Massanari*, 261 F.3d 853, 857-58 (9th Cir. 2001) (citing *Verduzco*

19  *v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999)).  This presumption can be rebutted by a showing of a

20  conflict of interest or by showing some other specific reason for disqualification.  *Schneider*, 456

21  U.S. at 195.  The burden of overcoming this presumption rests with the Plaintiff.  *Id.* at 196.  As

22  stated in *Rollins*, Plaintiff must establish "the ALJ's behavior, in the context of the whole case, was

23  so extreme as to display clear inability to render fair judgment."  *Rollins v. Massnari*, 261 F.3d at

24  858 (internal quotation marks omitted).

25       Here, ALJ Berry is presumed to be unbiased.  *Schneider v. McClure*, 456 U.S. at 195-196.

26  Plaintiff has failed to establish any evidence of bias in context of this particular case.  Plaintiff would

27  apparently have this Court reverse and remand ALJ Berry's findings in any case involving Mr.

28                                                  16

Milam's representation of the claimant based merely on the existence of the *Hixson* decision. This is completely contrary to the prevailing authority. More importantly, this case has none of the contentious behavior identified in the *Hixson* matter. The exchanges between all parties at the December 8, 2005, hearing were completely professional and pleasant. *See* AR 616-648. As Defendant points out in fact, ALJ Berry permitted Plaintiff here to take a break during testimony when Plaintiff became emotional. AR 629; *see also* AR 627. ALJ Berry did not exhibit any behavior here "so extreme as to display clear inability to render fair judgment." *Rollins v. Massanari*, 261 F.3d at 858. There is nothing in the instant record to indicate that ALJ Berry exercised his decision-making authority with anything but honesty and integrity. *Schneider*, at 195-196; *Rollins*, at 857-858.

Plaintiff's references to various statistics regarding ALJ Berry's findings in the matters handled by counsel's office compared to national averages are likewise unavailing. The information is irrelevant to this particular case and is therefore insufficient to establish bias.

In sum, Plaintiff has failed to overcome the presumption that an administrative adjudicator is unbiased. ALJ Berry rendered fair judgment. Moreover, this Court will not presume bias simply because it previously determined this particular ALJ was biased in another matter.

### B.        Substantial Evidence

Plaintiff asserts the ALJ's findings are not supported by the record as a whole, and that his review of the records was "incomplete and incorrectly analyzed." More particularly, Plaintiff complains that the ALJ failed to discuss all impairments at step two. Plaintiff contends the ALJ should have determined Plaintiff's depression to be severe, improperly determined Plaintiff did not need a cane and was capable of medium work. Defendant replies that the ALJ properly determined Plaintiff's depressive disorder was not a severe impairment, and that the ALJ's RFC determination is supported by substantial evidence and is legally sound.

### 1.        Depressive Disorder

The ALJ determined that Plaintiff's mental impairment or depressive disorder was not severe. Plaintiff claims this determination was error.

17

An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is properly made at step two when medical evidence establishes that a claimant has only a slight abnormality which would have no more than a minimal effect on his or her physical or mental ability to perform basic work activities.  SSR 85-28.

The listings of impairments describe impairments "that are considered severe enough to prevent an adult from doing any gainful activity." 20 C.F.R. § 416.925(a).  Most of these impairments are permanent or expected to result in death.  *Id.*  For all other impairments, the evidence must show that the impairment has lasted or is expected to last for a continuous period of at least twelve months.  *Id.*  If a claimant's impairment meets or equals a listed impairment, he or she will be found disabled at step three without further inquiry.  20 C.F.R. § 416.920(d).

To demonstrate that an impairment matches a listed impairment, the claimant must show that the impairment meets all of the medical criteria in a Listing.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).  "An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  *Id.*  To "equal" a listed impairment, a claimant must establish symptoms, signs and laboratory findings "at least equal in severity and duration" to the characteristics of a relevant listed impairment."  *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999); 20 C.F.R. §§ 404.1526(a), 416.926(a).  Under the law of this circuit, "[i]t is unnecessary to require the Secretary, as a matter of law, to state why a claimant failed to satisfy every different section of the listing of impairments."  *Gonzales v. Sullivan*, 914 F.2d 1197, 1201 (9th Cir.1990).

A mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings.  20 C.F.R. § 416.908.  Symptoms are a claimant's own description of his or her impairment, and alone are not enough to establish a mental impairment; signs include observable psychological abnormalities and must be medically demonstrable phenomena;  laboratory findings must be shown through medically acceptable laboratory techniques.  20 C.F.R. § 416.928.  The regulations are clear that reports about a claimant's impairments must come from "acceptable medical sources," and that a licensed social worker is not an accepted medical source.  20 C.F.R. § 416.913(a).

18

To determine whether a plaintiff has a mental impairment, one must assess the impairment according to the Regulations.  20 C.F.R. pt. 404, app. 1, subpt. P, § 112.05 (Listing 12.05).  The listing of impairments outlines criteria that claimants must meet in order to be determined impaired.  *Id.*  Listing 12.04 pertains to affective disorders.[4]

---

[4]Affective disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of one of the following:
    1. Depressive syndrome characterized by at least four of the following:
    a. Anhedonia or pervasive loss of interest in almost all activities; or
    b. Appetite disturbance with change in weight; or
    c. Sleep disturbance; or
    d. Psychomotor agitation or retardation; or
    e. Decreased energy; or
    f. Feelings of guilt or worthlessness; or
    g. Difficulty concentrating or thinking; or
    h. Thoughts of suicide; or
    i. Hallucinations, delusions, or paranoid thinking; or
    2. Manic syndrome characterized by at least three of the following:
    a. Hyperactivity; or
    b. Pressure of speech; or
    c. Flight of ideas; or
    d. Inflated self-esteem; or
    e. Decreased need for sleep; or
    f. Easy distractibility; or
    g.  Involvement in activities that have a high probability of painful consequences which are not recognized; or
    h. Hallucinations, delusions or paranoid thinking; or
    3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
AND
    B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration;
OR
    C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

1   Here, the ALJ acknowledged the treatment records from Fresno County Mental Health and an

2   initial diagnosis of major depressive disorder in June 2003 with a GAF of 50.  Medications were

3   prescribed and an improved GAF of 67 was recorded, indicating only mild symptoms. The ALJ

4   noted that Plaintiff's activities of daily living which include taking care of his four children do not

5   support a separate and independent severe depressive disorder."  He found that the depressive

6   disorder caused "no more than a mild degree of functional limitation" and was thus not severe.  AR

7   422.

8   Plaintiff suffers from a depressive disorder.  However, an impairment that "manifests only

9   some of [the listing criteria], no matter how severely, does not qualify" as a severe impairment.

10  *Sullivan v. Zebley*, 493 U.S. at 530.  That is the situation here.  A review of the medical records

11  pertaining to Plaintiff's mental health reveals that Plaintiff does not suffer from at four of the

12  impairments identified in subdivision (A) of Listing 12.04, nor has any physician indicated that

13  Plaintiff has been markedly affected as identified in subdivision (B) of Listing 12.04.

14  For example, on September 21, 2004, Plaintiff reported he was "doing a lot better.  Dr.

15  Trimmer noted no abnormalities in behavior, speech, affect, perception, thought process or content,

16  insight or judgment. AR 488.  On October 19, 2004, Plaintiff's behavior, speech, perceptions,

17  thought process and content, insight and judgment were good.  He was improving.  AR 486.  On

18  November 16, 2004, Dr. Trimmer's notes indicate Plaintiff "[a]ppears mildly anxious, but affect is

19  brighter than it has been in the past, [patient] seems happier overall."  AR 483.

20  Dr. Trimmer's reference to Plaintiff's difficulty with concentration specifically referenced

21  Plaintiff's financial problems and was a part of a letter seeking a continuance of a court appearance

22  on that basis and the need to hire counsel (AR 486), as opposed to an inability function socially or

23  maintain employment.

24

25

26  ─────────────

27        3. Current history of 1 or more years' inability to function outside a highly supportive living
       arrangement, with an indication of continued need for such an arrangement.

28                                          20

1    Notably too, Dr. Trimmer's progress notes include notations that the medication prescribed to

2    Plaintiff was beneficial.  AR 483, 486, 488.  Also, Plaintiff admitted at the hearing that medication

3    had improved his conditions.  AR 637-638.

4    Thus, a review of the entire record establishes that the ALJ's determination that Plaintiff's

5    depression is not a severe impairment is based upon substantial evidence and is free of legal error.

6    ### 2.    Use of Cane

7    Plaintiff asserts the ALJ wrongly rejected Plaintiff's need for a cane.  Defendant replies that

8    the ALJ rejected Dr. Smith's recommendation of a cane for several reasons, all of which were

9    proper.

10   In Dr. Smith's opinion of April 2001, he noted as follows: "As long as [Plaintiff] is able to

11   hang onto an object he does not need to use the cane but in the work place he would probably be

12   better off using a cane to keep his knee from giving away."  AR 187.  In his findings, the ALJ

13   explained his position:

14   > [T]his statement is not supported by the claimant's demonstration . . . of
15   > normal strength, normal gait, range of motion, coordination, and no deformities of the
     > lower extremities except for decreased range of motion of the right knee.  Claimant
     > was given a cane from his treating practitioner at the Veteran's Administration
16   > Medical Center in January 2001.  However, since Dr. Smith's consultative
     > examination was performed in April 2001, there have been no reports of instability or
17   > of the claimant falling.  Per Social Security Ruling 96-9p, an assistive device must be
     > *medically required* to substantially limit the claimant's ability to walk and stand in a
18   > work environment.  Since the claimant's initial knee injury in April 2000, the
     > claimant reported he fell on his right knee in March 2003 while playing basketball
19   > and injured his left hand while carrying a sofa hidabed in March 2005, and it stands to
     > reason he was not using a cane at these times.  Therefore, the totality of the evidence
20   > here indicates that the claimant may need a cane occasionally but not on a regular
     > basis, and that he is able to work and stand for extended periods without a cane.

21

22   AR 423, emphasis in original & internal citations omitted.  Notably too, Dr. Wong pointed out that

23   Dr. Smith's conclusion regarding Plaintiff's need for a cane was contradicted by Dr. Smith's own

24   findings.  *See* 212-213.  Dr. Smith noted no swelling or abnormalities of the right knee, and Plaintiff

25   was not limping or otherwise uncomfortable.  Plaintiff was able to stand on his toes and heels, his

26   knee was stable, and a torsion test revealed no locking or catching in the right knee.  AR 184-185.

27

28

1    Plaintiff did not testify regarding his specific use of the cane.  Rather, he merely indicated he

2    had been using it since a workers' compensation physician prescribed it following his injury.  AR

3    635.  When asked at the hearing about his ability to walk and stand during an eight-hour period,

4    Plaintiff did not indicate the need for an assistive device.  *See* AR 622-626, 638-640.

5    Despite the fact that others may have concluded differently, where the ALJ's findings are

6    supported by substantial evidence in the record, the findings are entitled to deference.  *Bayliss v.*

7    *Barnhart*, 427 F.3d 1211, 1214 (9th Cir. 2005).

8    To the degree Plaintiff is arguing that the ALJ improperly disregarded Dr. Smith's opinion,

9    there was no error.  Dr. Smith's opinion regarding Plaintiff's need for a cane did not correspond with

10   the doctor's own objective findings, as noted by Dr. Wong.  The foregoing is a specific and

11   legitimate reason for disregarding Dr. Smith's opinion regarding the cane.  *Orn v. Astrue*, 495 F.3d

12   625, 632 (9th Cir. 2007).

13              **3.    Medium Work**[5]

14   Plaintiff complains the ALJ's determination that he could perform medium work is erroneous

15   because it is not supported by substantial evidence.

16   Dr. Branscum precluded prolonged weight-bearing, *heavy lifting*, climbing, walking on

17   uneven ground, squatting, kneeling, crouching, crawling, and pivoting due to Plaintiff's right knee.

18   AR 202, emphasis added; *see also* AR 422.  This description is conducive to a finding of medium

19   work.

20

21   _____

22        [5]The definition of light work used by the Social Security disability system involves:

23        lifting no more than 20 pounds at a time with frequent lifting or carrying of objects
          weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in
24        this category when it requires a good deal of walking or standing, or when it involves
          sitting most of the time with some pushing and pulling of arm or leg controls.  To be
25        considered capable of performing a full or wide range of light work, you must have the
          ability to do substantially all of these activities.

26

27   20 C.F.R. § 404.1567(b).

28                                                      22

Dr. Smith determined that Plaintiff was to avoid repeated bending or heavy lifting.  He could lift fifty pounds occasionally and twenty-five pounds frequently, could sit, stand and walk for six hours in an eight-hour day with rest breaks, and could climb stairs, kneel and squat on an occasional basis.  AR 187; *see also* AR 422.  Again, Dr. Smith's findings are consistent with medium work.

Plaintiff complains that the MRI and reports of swelling and tenderness of the right knee confirm that the ALJ's medium RFC is not warranted.  Yet, the mere diagnosis of an impairment is not sufficient to sustain a finding of disability.  *Key v. Heckler*, 754 F.2d 1545, 1549 (9th Cir. 1985).  Additionally, the fact the ALJ did not address every medical record with particularity does not point to error.  *Howard v. Barnhart*, 341 F.3d 1006, 1010 (9th Cir. 2003), quoting *Vincent on Behalf of Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984).

The ALJ stated "I find the claimant retains the following residual functional capacity: ability to lift and carry 50 pounds occasionally and 25 pounds frequently; ability to stand, walk, and sit for 6 hours each, and at least 2 hours at a time.  He is limited to occasional climbing, stooping, and kneeling."  AR 426.  ALJ Berry also indicated that in making this RFC finding, he "considered all the medical opinions, which are statements from acceptable medical sources . . .."  AR 425; *see also* AR 426 ["[a]fter careful consideration of the entire record . . ."].  Significantly, the ALJ had previously noted that "[m]uch of the updated medical records from 2004 to 2005 deal with medical problems other than degenerative joint disease of the right knee."  AR 424.  *See Bayliss v. Barnhart*, 427 F.3d at 1214.

In conclusion, there is sufficient evidence in the record to conclude Plaintiff is capable of medium work, and thus, no error occurred.

**C.   Credibility**

Plaintiff complains the ALJ did not fully and fairly review "the testimony and documentary representations" offered by Plaintiff.  More particularly, Plaintiff claims the evidence relied upon was "out of context."  Defendant replies there was no error.

The ALJ is required to make specific findings assessing the credibility of a plaintiff's subjective complaints.  *Cequerra v. Secretary of HHS*, 933 F.2d 735 (9th Cir. 1991).  "An ALJ is not

1  'required to believe every allegation of disabling pain' or other non-exertional impairment." *Orn v.*

2  *Astrue*, 495 F.3d at 635 (citation omitted).  In rejecting the complainant's testimony, "the ALJ must

3  identify what testimony is not credible and what evidence undermines the claimant's complaints."

4  *Lester v. Chater,* 81 F.3d 821, 834 (9th Cir. 1996), quoting *Varney v. Secretary of Health and*

5  *Human Services,* 846 F.2d 581, 584 (9th Cir. 1988).

6           In making this determination, the ALJ conducts a two-step analysis to assess subjective

7  testimony.  Under step one, the claimant "must produce objective medical evidence of an underlying

8  impairment" or impairments that could reasonably be expected to produce some degree of symptom.

9  *Tommasetti v. Astrue*, 533 F. 3d 1035, 1039 (9th Cir. 2008).  If the first step is met and there is no

10  affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity

11  of her symptoms only by offering specific, clear and convincing reasons for doing so." *Id*.  Factors

12  the ALJ may consider in weighing a claimant's credibility include "(1) ordinary techniques of

13  credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements

14  concerning the symptoms, and other testimony by the claimant that appears less than candid; (2)

15  unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of

16  treatment; and (3) the claimant's daily activities." *Id*., citing *Smolen v. Chater*, 80 F. 3d 1273 (9th

17  Cir. 1996).  If the ALJ's finding is supported by substantial evidence, the court "may not engage in

18  second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

19           Here, the ALJ found in pertinent part:

20       The claimant's credibility is questionable.  Claimant had frequent refills of Vicodin, and
         stated he took from 2 to 4 tablets a day.  It was reported in July 2003 that claimant was
21       "addicted to Vicodin" and was suspected of "double dipping" or going to different
         pharmacies for refills (Exhibit AC-15, p. 30.)  When claimant was at a pain clinic, he was
22       very evasive about how many medications he was taking.  Claimant left, and was discharged
         from the pain clinic (Exhibit AC-15, p. 22).
23           Claimant has alleged his onset date as April 28, 2000, but [many citations to
         the contrary] put his allegation into serious dispute [citations].
24           Accordingly, having considered the entire record, both medical and
         nonmedical and specifically including the claimant's testimony and demeanor at the
25       hearing, I do give credence to the claimant's subjective complaints to the extent he is
         suffering from a degree of pain.  However, . . .I do not find his subjective complaints
26       to be credible to the degree alleged, and his testimony appears to be overstated.
         Although claimant's testimony was vague as to his daily activities, he did state at his
27       first hearing he helped around the house, drove his children to school, watched

28                                                    24

television, and he tries to keep up with his twin daughters and the other children. Many of these tasks replicate those necessary for obtaining and maintaining employment.  The claimant also testified that he could only lift and carry weight up to 20 pounds, yet he was reported to have lifted a sofa hidabed.  The claimant also testified he does not drive, and he did not do child care; however, in March 2005 he could not keep appointments . . . because he had to pick up his children [citation]. Even if the claimant's activities are limited, this may be due to lack of motivation since the medical record is not consistent with the degree of the alleged subjective complaints.

AR 425.

Plaintiff claims the ALJ summarized evidence out of context, then states the ALJ speculated about pain medication "without any evidence to confirm any addiction."  Plaintiff provides no authority for the necessity of confirming an addiction.  Indeed, Plaintiff has taken the ALJ's reference out of context.  The ALJ expressly referenced the record wherein it was noted on July 14, 2003, Dr. K. Vilaysane of UMC's Family Health Center, as part of a follow-up for Plaintiff's lower back pain, refilled a prescription for sixty Vicodin tablets and noted "[Patient] addicted to Vicodin. Frequent Refill. ? Double dipping/going to different pharmacy."  AR 610.  A careful review of the record further reveals that a progress record prepared by Dr. Vilaysane on March 27, 2003, also provides the following notation: "Advised [patient] not to call back for more Vicodin until 3 months from now.  Rx given to last 3 months."  AR 612.  A previous entry dated February 21, 2003, about one month prior, indicates the Vicodin prescription was refilled at that time.  AR 613.  A progress record dated February 14, 2005, states Plaintiff's chief complaint was the need to refill medications, apparently because he had been "(denied)."  AR 590.  Moreover, a January 15, 2004, notation from the pain clinic, states Plaintiff "left angry after [he] was evasive about how many pain medications he is taking. He began threatening me."  Plaintiff was discharged from the pain clinic thereafter.  *See* AR 602.  These entries further supports the ALJ's credibility finding and his inferences therefrom were reasonable.   The ALJ may properly considered this evidence.  *Tommasetti v. Astrue*, 533 F.3d at 1039.  This evidence relates to Plaintiff's credibility.  *Id.*

As Defendant notes, the ALJ may consider inconsistencies between a claimant's testimony and the evidence.  *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995).  The ALJ properly considered Plaintiff's testimony at the hearing about not doing "much of anything" (AR 628) and

1 that he could not lift more than twenty pounds even on a good day (AR 626) as compared to the

2 medical record and notations that Plaintiff played basketball or moved a sofa hidabed, and Dr.

3 Branscum's report that referenced strenuous activity such as "push ups."  AR 198.  These

4 inconsistencies were properly considered by the ALJ.  *Tommasetti v. Astrue*, 533 F.3d at 1039.

5   ALJ Berry made a credibility determination with findings sufficiently specific to permit this

6 Court to conclude that he did not arbitrarily discredit claimant's testimony.  *See Bunnell v. Sullivan*,

7 947 F.2d 341, 345-46 (9th Cir.1991) (en banc).

8   **D.**  **Treating Physician Opinions**

9   Finally, Plaintiff asserts that the ALJ failed to properly consider the opinions of Drs.

10 Troncoso and Trimmer.  Defendant responds the ALJ properly considered, and properly rejected, the

11 opinions of the physicians.

12   The opinions of treating doctors should be given more weight than the opinions of doctors

13 who do not treat the claimant.  *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir.1998); *Lester v.*

14 *Chater*, 81 F.3d at 830.  Where the treating doctor's opinion is not contradicted by another doctor, it

15 may be rejected only for "clear and convincing" reasons supported by substantial evidence in the

16 record.  *Lester*, 81 F.3d at 830.  Even if the treating doctor's opinion is contradicted by another

17 doctor, the ALJ may not reject this opinion without providing "specific and legitimate reasons"

18 supported by substantial evidence in the record.  *Id.*, quoting *Murray v. Heckler*, 722 F.2d 499, 502

19 (9th Cir.1983).  This can be done by setting out a detailed and thorough summary of the facts and

20 conflicting clinical evidence, stating his interpretation thereof, and making findings.  *Magallanes  v.*

21 *Bowen*, 881 F.2d 747, 751 (9th Cir.1989).  The ALJ must do more than offer his conclusions.  He

22 must set forth his own interpretations and explain why they, rather than the doctors', are correct.

23 *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir.1988).

24   In *Orn v. Astrue,* 495 F.3d 625, the Ninth Circuit reiterated and expounded upon its position

25 regarding the ALJ's acceptance of the opinion of an examining physician over that of a treating

26 physician.  "When an examining physician relies on the same clinical findings as a treating

27 physician, but differs only in his or her conclusions, the conclusions of the examining physician are

28         26

not '"substantial evidence."'  *Orn,* 495 F.3d at 632; *Murray*, 722 F.2d at 501-502.  "By contrast,

when an examining physician provides 'independent clinical findings that differ from the findings of

the treating physician' such findings are 'substantial evidence.'"  *Orn,* 496 F.3d at 632; *Miller v.*

*Heckler*, 770 F.2d 845, 849 (9th Cir.1985).  Independent clinical findings can be either (1) diagnoses

that differ from those offered by another physician and that are supported by substantial evidence

(*see Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1985)), or (2) findings based on objective

medical tests that the treating physician has not herself considered (*see Andrews v. Shalala*, 53 F.3d

1035, 1041 (9th Cir. 1995)).

        If a treating physician's opinion is not given controlling weight because it is not well

supported or because it is inconsistent with other substantial evidence in the record, the ALJ is

instructed by Section 404.1527(d)(2) to consider the factors listed in Section 404.1527(d)(2)-(6) in

determining what weight to accord the opinion of the treating physician.  Those factors include the

"[l]ength of the treatment relationship and the frequency of examination" by the treating physician;

and the "nature and extent of the treatment relationship" between the patient and the treating

physician.  20 C.F.R. 404.1527(d)(2)(i)-(ii).  Other factors include the supportablility of the opinion,

consistency with the record as a whole, the specialization of the physician, and the extent to which

the physician is familiar with disability programs and evidentiary requirements.  20 C.F.R. §

404.1527(d)(3)-(6).   Even when contradicted by an opinion of an examining physician that

constitutes substantial evidence, the treating physician's opinion is "still entitled to deference."  SSR

96-2p; *Orn*, 495 F.3d at 632-633.  "In many cases, a treating source's medical opinion will be

entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling

weight."  SSR 96-2p; *Orn*, 495 F.3d at 633.

                    *ALJ's Findings Regarding Mental Health*

        ALJ Berry found as follows:

                There are three medical opinions addressing claimant's mental status.  Dr.
        Robert Trimmer wrote letters requesting [the] postponement of claimant's court date
        for a Workers' Compensation hearing.  However, these letters appear to have been
        written to give the claimant more time to get a lawyer and to get his financial
        problems settled rather than an assessment of the claimant's mental status [citation].

1      Therefore, little weight is given to these letters.
               I also give little weight to a request for a Special Rider Certificate which was
2      completed in October 2004 by Counsel Kathleen Henry . . ..

3              A medical assessment prepared by Dr. Ariel Troncoso indicated claimant had
       a fair to poor ability to make adjustments to work [citation].  However, Dr. Troncoso
4      treated the claimant only once, in January 2005 [citation].  Therefore, little weight is
       given to this assessment, as it is not supported by the medical records.

5

6   AR 422.

7          Overall, the ALJ concluded that based upon the medical records of Fresno County Mental

8   Health for the period between June 2003 and October 2005, Plaintiff's depressive disorder presented

9   no more than a mild degree of functional limitation and was therefore not a severe impairment.  ALJ

10  Berry also noted that Plaintiff's activities of daily living did not support a finding of severe

11  depressive disorder, and a depression screen prepared by Plaintiff's treating physician at UMC

12  during the same time frame did not elicit any indication or symptom of depression.  AR 422.

13              *Analysis*

14          With regard to Dr. Troncoso, the ALJ specifically indicated that little weight was assigned to

15  her opinion because she had only one contact with Plaintiff before preparing a later report that lacked

16  objective findings.  AR 422.  *Tackett v. Apfel*, 180 F.3d at 1099 ("a claimant must establish

17  symptoms, signs and laboratory findings").   A review of the record indicates that Dr. Troncoso saw

18  Plaintiff on January 28, 2005, and again on September 2, 2005.[6]  AR 476-477, 482.  In January 2005,

19  the record indicates that a case worker provided Dr. Troncoso with information concerning Plaintiff.

20  The session lasted only fifteen minutes.  AR 482.  Thus, the letter Dr. Troncoso authored on January

21  28, 2005, was not based upon her own objective findings.  Dr. Troncoso's findings conflicted with

22  those of Plaintiff's treating physician at UMC wherein on January 21, 2004, it was noted a

23  depression screen was performed and Plaintiff did not acknowledge any depression, nor did he

24  exhibits the signs.  AR 555-556.

25

26  _____

27          [6]It appears Plaintiff was treated by two other mental health physicians in the interim: on March
    29, 2005 (AR 481) and May 18, 2005 (AR 480).

28                                          28

1    The doctor's only other interaction with Plaintiff included the September 2, 2005, occasion

2    wherein Plaintiff wanted someone other than Dr. Troncoso to undertake his treatment.  He was loud

3    and used profanity in the front office and reception area.  AR 476.  Dr. Troncoso and another

4    physician reviewed Plaintiff's chart and approached Plaintiff in the waiting area.  He was offered

5    several alternatives, but refused to be interviewed within the presence of security personnel, and left

6    the facility.  AR 476.  It is specifically noted that while Plaintiff was loud and angry, his appearance

7    was appropriate, his thought process was goal-directed and linear and coherent.  His insight was fair.

8    AR 477.

9    Significantly, Dr. Troncoso's November 4, 2005, report fails to identify any medical or

10   clinical findings in support of her conclusions (AR 573-574), and, therefore, is not well supported by

11   the record.  ALJ Berry provided specific and legitimate reasons for rejecting Dr. Troncoso's opinion

12   in that regard.

13   With regard to Dr. Trimmer, the opinion of whom Plaintiff contends the ALJ failed to

14   properly consider and credit, the ALJ expressly stated he was affording little weight to Dr.

15   Trimmer's *letters*.  AR 422, emphasis added.  It is clear that the ALJ considered Dr. Trimmer's

16   treatment of Plaintiff because there are specific references to Dr. Trimmer's many progress notes:

17   
18   
19   
> Symptoms included depressed mood, anhedonia, insomnia, low self-esteem and anxiety.  Treatment records show that the numerous medications prescribed were generally successful in reducing the claimant's symptoms when he was complaint with them (Exhibits . . .*AC-2, pp. 13-15, 16, 20-23, 31, 33, 35, 39.*)

20   AR 422, emphasis added.  Plaintiff's claim is simply unpersuasive.  The Court finds, as did the ALJ,

21   that the letters appear to have been written to provide Plaintiff with more time to obtain legal

22   representation and to address his financial difficulties rather than act as a true assessment of

23   Plaintiff's mental health.  Thus, these letters do not amount to an opinion in the true sense.

24   Furthermore, as noted *ante*, a review of Plaintiff's mental health records establishes that while

25   Plaintiff was often depressed, irritable or anxious, for the great majority of his sessions with Dr.

26   Trimmer, Plaintiff's appearance, behavior, speech, perceptions, thought process and content, and

27   insight and judgment were fair or normal.

28
                                    29

1    In light of the foregoing, the ALJ properly afforded Dr. Trimmer's letters little weight, and

2 provided specific and legitimate reasons for doing so.

3                                    **RECOMMENDATION**

4    Based on the foregoing, the Court finds that the ALJ's decision is supported by substantial

5 evidence in the record as a whole and is based on proper legal standards.   Accordingly, the Court

6 RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of

7 Social Security be DENIED and that JUDGMENT be entered for Defendant Michael J. Astrue and

8 against Plaintiff Terry M. Adams.

9    These findings and recommendations will be submitted to the Honorable Oliver W. Wanger

10 pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fifteen (15) court days after being

11 served with these findings and recommendations, the parties may file written objections with the

12 court.  The document should be captioned "Objections to Magistrate Judge's Findings and

13 Recommendations."  The parties are advised that failure to file objections within the specified time

14 may waive the right to appeal the District Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

15 1991).

16

17    IT IS SO ORDERED.

18  **Dated:   September 14, 2009**                  _____/s/ **Gary S. Austin**_____
                                            UNITED STATES MAGISTRATE JUDGE
19

20

21

22

23

24

25

26

27

28                                         30